FRANK M. SARACENO & others *vs.* CITY OF PEABODY & others
(and a companion case).

Essex.    March 9, 1972. — May 1, 1972.

Present: TAURO, C.J., CUTTER, SPIEGEL, REARDON, & HENNESSEY, JJ.

*Municipal Corporations*, Referendum. *Peabody. Equity Jurisdiction,* Declaratory relief. *Equity Pleading and Practice,* Bill, Declaratory proceeding. *Words,* "Measure."

Section 52 of the city charter of Peabody, requiring that for passage a measure receive the affirmative votes of at least one third of the whole number of registered voters, applies only to "a proposed measure" presented by an initiative petition and has no application to a measure submitted to the voters under the referendum procedure prescribed by § 48; thus a referendum measure which received a majority of the votes cast, but not one third of the whole number of registered voters, was properly passed, and the petitioners were not entitled to a writ of mandamus to compel certification that the measure had been disapproved. [698–700]

Where a bill in equity seeking injunctive and declaratory relief was confused, did not state clearly the ground on which relief was sought, and did not present a case in which a declaration of rights was required, a demurrer to the bill was rightly sustained. [701–702]

PETITION for a writ of mandamus filed in the Superior Court on November 30, 1970.

BILL IN EQUITY filed in the Superior Court on July 7, 1970.

The cases were heard by *Linscott,* J., on demurrers.

*Emmanuel N. Papanickolas* for Frank M. Saraceno & others.

*Charles J. Speleotis,* Assistant City Solicitor, for the City of Peabody & others.

*George Ankeles* for Peabody Redevelopment Authority.

CUTTER, J. By an amended petition, the petitioners (the taxpayers) in the first case bring this petition for a writ of mandamus against the city, the members of the city council, the board of registrars, and the city clerk. The taxpayers seek to compel certification that a bond order measure described below, approved by the city council, was disapproved by the voters because "it failed to carry by [affirmative vote of] at least one-third of the total registered voters." A demurrer was sustained. The taxpayers appealed.

The second case is a bill in equity by the same taxpayers against the same defendants, and also against the mayor, the city treasurer, the city auditor, and the Peabody Redevelopment Authority (the Authority). The bill seeks injunctive relief against the issue and sale of bonds and also asks declaratory relief in general terms. The Authority's demurrer and the separate demurrer of all the other defendants were sustained. Leave to amend was denied. The taxpayers appealed from the interlocutory decrees sustaining the demurrers and from a final decree dismissing the bill.

## THE MANDAMUS PROCEEDING.

The mandamus petition alleges the following matters among others. The city council on March 31, 1970, adopted a bond order appropriating $1,500,000 and authorizing the borrowing of that sum to defray the costs of an industrial park project. A referendum petition, protesting the vote, was filed by a sufficient number of voters on April 13, 1970. The city council reconsidered the vote (see the Peabody city charter, Sp. St. 1916, c. 300, § 48, fn. 2, *infra*) but did not annul or rescind it.

The charter provisions are discussed below (see fns. 1–5 and related text of this opinion).

A special election was called for and held on June 16, 1970. After recount, it appeared that 5,561 voters had voted for the measure and 5,336 voters had voted against it. One-third of the whole number of Peabody's registered voters on the date of the election was 7,639. The taxpayers contend that the measure is void because it received affirmative votes of less than one-third of the total number of registered voters (see charter, § 52, fn. 4, *infra*). They allege that the respondents have treated the bond order as approved by the majority vote alone and intend to sell the bonds. The taxpayers ask that the respondents be ordered to issue election certificates declaring the bond order ineffective.

As we read the Peabody charter, it treats (a) proposed measures based upon an initiative petition on a different basis from (b) measures originated by the city council concerning which a referendum may be had. If an initiative "proposed measure" under § 47 of the charter,[1] is not passed within twenty days by the city council it must be submitted to the voters, but only at the next regular election. A referendum (§ 48) takes place concerning "any measure" finally passed by the city council upon the filing of a protest signed by at least the necessary number of registered voters.[2] This may be as to a "measure or any

---

[1] Section 47 of the charter provides for initiative petitions "by at least eight per cent but less than twenty per cent of the total number of registered voters" for a measure which if not passed "within twenty days by the city council . . . then *such proposed measure*, without alteration, shall be submitted by the city council to a vote of the registered voters of the city at the next annual city election" (emphasis supplied).

[2] Section 48 of the charter reads (emphasis supplied): "If within twenty days after the *final passage* of any measure by the city council . . . a petition signed by [at least twelve per cent of the total number of] registered voters . . . be presented to the city council . . . protesting against such measure or any part thereof, the same shall thereupon . . . be *suspended* from taking effect; and the city council . . . shall immediately reconsider such *measure or part thereof*; and if *such* measure *or part thereof* be not entirely annulled . . . the city council shall submit the same, *by the method herein provided*, to a vote of the qualified voters of the city, either at the next regular

part thereof." This referendum petition suspends the measure. If, upon reconsideration by the city council, the "measure or any part" is "not entirely annulled," the matter goes to a referendum vote "either at the next regular city election, or at a special election." [3] The measure (§ 48) will become "null and void unless" approved by a majority of the voters voting on the issue.

Section 48 contains no reference to obtaining "the affirmative votes of at least a third of the whole number of registered voters." This provision, found only in § 52,[4] we think relates only to a "proposed measure," a term applied to proposals by initiative petitions. See § 47 (fn. 1) and § 46 (fn. 3).[5] Each "proposed measure" presented by initiative petition, of course, never has

---

city election, or at a special election . . . and *such measure or part* thereof shall forthwith become null and void unless a majority of the qualified voters voting on the same at such election shall vote in favor thereof. The petition provided for by this section shall be termed a referendum petition. The procedure in respect to the referendum petition shall be the same as that provided by . . . [§ 47] except that the words *'measure* or part thereof *protested against'* shall for this purpose be understood to replace the word 'measure' in that section wherever it may occur, and that the word 'referendum' shall be understood to replace the word 'initiative' . . . ."

[3] Section 46 of the charter provides for an initiative petition, which (if signed by at least twenty per cent of the city's voters and if not passed by the city council without alteration) requires submission of the "proposed measure" to the voters at a special election unless a city election is otherwise to occur within ninety days.

[4] Section 52 reads: "The ballots used in voting upon any such *proposed measure* shall state the nature thereof in terms sufficient to show its substance. No *measure shall go into effect* unless it receives the *affirmative votes of at least a third* of the whole number of registered voters" (emphasis supplied).

[5] The term "proposed measure" (as used in § 52) also, perhaps, may apply to matters submitted to popular vote by the council on its own motion under § 50 of the charter. That is a matter which we need not now decide. Section 50 (emphasis supplied) reads: "The city council may, of its own motion . . . submit to a vote of the registered voters of the city for adoption or rejection at a general or special city election any *proposed measure,* or a proposal for the annulment, repeal or amendment of any *measure,* in the same manner and with the same . . . effect as are hereby provided for submission on petition." The term "proposed measures" also appears in a context likely to have significance only with respect to matters presented by initiative petition, in § 51, which reads (emphasis supplied): "If two or more *proposed measures* passed at the same election contain conflicting provisions, that one of the *measures* which received the larger number of affirmative votes shall take effect and the other to the extent of the inconsistency, shall be void."

reached the stage of a "final passage." There is obviously a more compelling reason for requiring affirmative approval (by a minimum number of voters) of such a "proposed measure," than there is with respect to a "measure" (as to which a referendum is sought under § 48) which already has received "final passage" by the city's legislative body.

In the light of the foregoing considerations we conclude that § 52 of the charter does apply to proposed measures presented by initiative, but has no application to referenda under § 48. As to a "measure" which has been passed finally by the city council, operation is only suspended pending approval of a majority of the registered voters participating in the referendum. The suspension ends, we rule, once the measure has been approved by a majority of the voters caring enough about the subject matter to vote in the referendum. If the 1916 Legislature had intended the result for which the taxpayers contend, a precise provision easily could have been inserted like that in the Lynn city charter set out in the margin.[6]

The taxpayers refer us to no authority which supports their position. *Gorman* v. *Peabody*, 312 Mass. 560, 568, does not discuss § 48 with respect to the present issue.[7]

*Order sustaining demurrer affirmed.*

---

[6] Special Statute 1917, c. 340, § 54, the Lynn charter (nearly contemporary with the Peabody charter), expressly stated in the provision for a referendum that the "measure or part thereof shall . . . become . . . void unless a majority of the qualified voters voting on the same . . . shall vote in favor thereof, *and unless it receives the affirmative vote of at least a third of the whole number of registered voters*" (emphasis supplied). It should be noted that no provision of G. L. c. 43, §§ 37–44, as amended, requires a minimum number of affirmative votes with respect to a *referendum,* but § 40 requires that one-third of the whole number of registered voters approve an initiative measure proposed.

[7] What has been said (on the merits of the taxpayers' contention) disposes of the mandamus petition. There is no occasion to consider objections by the respondents that, in any event, mandamus will not lie to compel some of the respondents to perform (a) duties in a particular manner, or (b) acts which they already have purported to perform in a manner different from what the taxpayers deem correct.

## THE BILL IN EQUITY.

The bill in equity makes somewhat confused and prolix allegations. Among these are the following: The city council rezoned an area (the locus) from Residential A–1 to Industrial A–2. Opposition to this was at least relaxed by alleged misrepresentations by city council members that this rezoning "meant no takings by eminent domain in the future." During the period of this discussion of rezoning, the city "set in motion . . . [a] so-called blighted open land program under" G. L. c. 121 and c. 121A. Notice by publication (in two newspapers of local circulation) of a public hearing before the city council to be held on June 26, 1969, was given on June 13 and June 20. The public hearing was held. The notice given did not comply with the twenty day notice requirement of G. L. c. 121, § 26P (now found in substance in G. L. c. 121B, § 47, inserted by St. 1969, c. 751, § 1. This 1969 statute was approved on August 21, 1969, and was not effective when the approvals hereinafter mentioned were given by the city council). The Authority, on August 4, 1969, declared the locus a "decadent and blighted open area." No notice of such determination has been given as required by § 26P, nor has there been notice of "a public hearing to determine whether the . . . [locus] meets the requirements of" G. L. c. 121, § 26J, "as a blighted open area." On August 5, 1969, the city council approved the Authority's "open blighted program" and the city and the Authority have entered into a cöoperation agreement. The Commonwealth's Department of Community Affairs, on a date not specified in the bill, has "approved the [Authority's] plan . . . for a state-aided Urban Renewal Industrial development of" the locus under cc. 121 and 121A, "as amended to" G. L. c. 121B. The locus "could and would be developed by private enterprise, and does not conform to any of the conditions defining a blighted open area under" c. 121, § 26J. Private "developers in cooperation with present land owners are presently planning to develop and market a portion of" the locus "as a private industrial park." Then follow allegations con-

cerning the city council bond order very much like those in the mandamus petition.

1. It is far from clear on precisely what grounds the taxpayers seek relief. An effort to obtain relief under the city charter against the city council because of its bond order is joined with an attempt to have a remedy against the city council and the Authority for alleged violation of the provisions of G. L. c. 121 and c. 121B. To some extent the theory of the bill may be that of a ten taxpayers' suit. See *Povey* v. *School Comm. of Medford,* 333 Mass. 70, 72. There are vague, general, and unsupported allegations, amounting at most to mere conclusions, not only that thé action of the Authority and various Peabody officials denied the taxpayers due process of law, but also that provisions of G. L. cc. 121, 121A and 121B are unconstitutional. The Attorney General has not been joined as a party. See G. L. c. 231A, § 8. The vague allegations of misrepresentation or fraud are not admitted by demurrer. See *J. J. Gordon, Inc.* v. *Worcester Tel. Pub. Co. Inc.* 343 Mass. 142, 143.

In the circumstances the bill is subject to demurrer on general grounds. It is not one concerning which a declaration of the rights of the parties is required. See *Brown* v. *Neelon,* 335 Mass. 357, 361; *Picard* v. *Worcester,* 338 Mass. 644, 647. See also *Cary Realty Corp.* v. *Chelsea,* 345 Mass. 769; *Johnson Prod. Inc.* v. *City Council of Medford,* 353 Mass. 540, 545–546; *Poremba* v. *Springfield,* 354 Mass. 432, 434–435.

2. Although the demurrer was properly sustained on general grounds, we mention briefly issues which the taxpayers attempt to raise for decision on the merits. They rely mainly on the Authority's and the city council's alleged failure to comply with the notice and hearing requirements of the last paragraph of G. L. c. 121, § 26P.[8]

---

[8] See the last paragraph of § 26P (inserted by St. 1961, c. 188, § 1, and as amended through St. 1968, c. 230). This paragraph as amended and the titles of the 1961 and 1968 statutes just mentioned suggest that § 26P may have a much more limited scope of application than that for which the taxpayers contend.

The defendants in effect contend that § 26P was not applicable to this project at all.

We find it unnecessary now to deal with this issue and with other questions, involving the interpretation of various sections of G. L. c. 121 and c. 121B, as amended.[9] The existing statutes were much rearranged by St. 1969, c. 751, §§ 1, 2, which became effective after many of the events alleged in the bill. The Attorney General and various State agencies concerned with those statutes have not been heard in this case and such questions preferably should be dealt with in proceedings in which they are parties or interveners.

3. The taxpayers attach to their brief a copy of a city council resolution adopted August 5, 1969, and a notice of a public hearing to be held on June 26, 1969. They request leave in their brief to amend their bill by including these documents in the bill. That motion is denied. In considering the demurrers, we do not go beyond the allegations of the bill. *Siegel* v. *Knott*, 316 Mass. 526, 528.

> *Interlocutory decrees affirmed.*
> *Final decree affirmed with costs*
> *of appeal.*

---

[9] Among such questions are: (1) To what extent does § 26P relate only to situations where (a) an immediate eminent domain taking, or (b) borrowing from the Federal government, is involved? (2) Does § 26P have application to land assembly and development projects to be carried out (prior to the effective date of the 1969 enactment of c. 121B) under c. 121, part IV, §§ 26JJ-26MM? See c. 121, parts VI and VIII, and § 26KK (as amended through St. 1960, c. 776, § 6), § 26MM (as amended through St. 1953, c. 647, § 19), § 26QQ (as amended through St. 1957, c. 150, § 1, and St. 1958, c. 299), and § 26ZZ (as amended through St. 1968, c. 142, §§ 1, 2, and c. 153).